Bryan C. WILSON–RICH, Plaintiff,

v.

DON AUX ASSOCIATES, INC., Defendant.

No. 80 Civ. 0741 (GLG).

United States District Court, S. D. New York.

Oct. 29, 1981.

Lieberman, Rudolph & Nowak, New York City, for plaintiff; Arthur M. Lieberman, New York City, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant; Kenneth A. Plevan, Joyce L. Kramer, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

Rocket of London, Inc. (Rocket) is a closely held corporation located in Branford, Connecticut. The company distributes medical products, which it imports from Rocket of London Ltd. (Rocket-London), a manufacturer of medical products in England. The plaintiff, Bryan C. Wilson-Rich, is the president of Rocket and owns fifty percent of the company. The other fifty percent is owned or controlled by Ernest Bernberg, who is the chairman of the board and managing director of Rocket-London. Of that fifty percent, ten percent is owned by Cedric Bernberg, Ernest's nephew, who is vice president of Rocket.

The defendant, Don Aux Associates, Inc. (Don Aux), is a small management consulting firm that specializes in small closely held corporations.[1] On August 5, 1979, Charles Auerbach, a salesman for Don Aux, visited the Branford offices of Rocket. Having asked to see the president of the company, Auerbach was directed to Wilson-Rich. During their conversation, Auerbach explained the services that Don Aux offered, and the plaintiff identified personnel motivation and morale as an area of concern in the company. At the conclusion of the meeting, Auerbach and Wilson-Rich signed a contract for an initial diagnostic survey[2] to be performed by Don Aux for Rocket. The contract was a one page form contract that lists the companies as the contracting parties, with the individuals

---

1. The company provides two types of services to its clients. In addition to traditional consulting services, it also performs diagnostic surveys. The purpose of the survey is to identify problem areas within a company and recommend solutions.

2. *See* note 1 *supra.* During this meeting, Wilson-Rich told Auerbach that Don Aux's consulting services would not be utilized unless Rocket-London approved.

signing on behalf of the companies. The contract had one handwritten note on the face of it, stating that payment of the fee was subject to the client's belief that the study was of significant value.

Between September 10 and September 19, 1979, two employees of Don Aux, Thomas O'Connor and Eileen Cummings,[3] conducted the survey at Rocket's offices in Connecticut. They distributed questionnaires to all employees and on the basis of the questionnaires, selected several people for personal interviews. The fruits of this effort were compiled in a written report.

The report was very critical of the plaintiff's management of the company and included summaries of what the employees had said about his deficiencies. In at least a couple of cases, the employees who said certain things were identified, and in other cases, Wilson-Rich could probably figure out the source of the statement. (On the questionnaire given to the employees, Don Aux stated that those who responded to the survey would remain anonymous. Apparently, the individuals who were identified in the report had indicated that they did not care if their names were revealed.)[4]

On September 19, a copy of this report was mailed to Wilson-Rich, Ernest Bernberg, and Cedric Bernberg. (Apparently, it was Don Aux's policy to send reports to all stockholders who were active in the company.) Wilson-Rich, however, was incensed when he learned that the report had been sent to the Bernbergs. He called Don Aux and said that their contract had been breached and that the report was supposed to be confidential and sent only to him. Subsequently, he commenced this diversity action.

In Count One of his complaint, the plaintiff alleges that by sending the report to the Bernbergs without his permission, Don Aux breached an agreement to provide the results of the survey only to him. Count Two, entitled "Intentional Interference with Employee Relations," alleges that because the report referred to individuals and job titles, the "plaintiff's ability to . . . manage and communicate [effectively] was damaged to an irreparable extent due . . . to the hard feelings generated within plaintiff himself toward those employees." Complaint ¶ 23. Count Three, entitled "Breach of Assumed Fiduciary Relationships," contains an allegation that the survey was to be confidential "both in the respect that the report was to be rendered to plaintiff, and plaintiff alone, and that the sources of information were to remain masked," Complaint ¶ 26, and that the defendant "breached these confidential relationships." Complaint ¶ 27. The defendant has moved for summary judgment pursuant to Fed.R.Civ.P. 56 on Count One. As to Counts Two and Three, it has moved to dismiss on the grounds that they fail to state claims upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), or alternatively, for summary judgment. For the reasons stated in the subsequent paragraphs, these motions are granted.

## I. *Breach of Contract*

Before turning to the merits of defendant's motion for summary judgment, it is appropriate to delineate briefly the standards for granting summary judgment. Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The purpose of the procedure is to go beyond the pleadings to determine if a genuine need for a trial exists. Advisory Committee Note to Proposed Amendments to Rule 56(e), 31 F.R.D. 648 (1962).

---

**3.** Since that time, Eileen Cummings has become Eileen O'Shea. Throughout this opinion, she will be referred to as Eileen Cummings.

**4.** There is some dispute as to whether these employees waived their right to anonymity. Resolution of this question, however, is not necessary for the purposes of this motion.

The Second Circuit has taken a restrictive attitude concerning the propriety of granting summary judgment.[5] *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir. 1980); *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317 (2d Cir. 1975). It has repeatedly admonished trial courts to determine only whether there are issues of fact to be tried and to avoid the temptation of making a subconscious judgment on the quality of proof by trying the issues. *Heyman v. Commerce and Industry Insurance Co., supra*, 524 F.2d at 1319–20; *accord, Flli Moretti Cereali v. Continental Grain Co.*, 563 F.2d 563, 566 (2d Cir. 1977); *United States v. Matheson*, 532 F.2d 809, 813 (2d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 185 (1976). Moreover, the party moving for summary judgment has the burden of showing the absence of a genuine issue as to a material fact, *Quinn v. Syracuse Model Neighborhood Corp., supra*, 613 F.2d at 444; *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 555 (2d Cir. 1977); *Heyman v. Commerce and Industry Insurance Co., supra*, 524 F.2d at 1320, and all reasonable inferences must be drawn in favor of the party opposing the summary judgment motion. *Quinn v. Syracuse Model Neighborhood Corp., supra*, 613 F.2d at 445; *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978); *United States v. Matheson, supra*, 532 F.2d at 813; *Heyman v. Commerce and Industry Insurance Co., supra*, 524 F.2d at 1320.

"Rule 56, however, is not a dead letter" in the Second Circuit. *Steinberg v. Carey*, 439 F.Supp. 1233, 1241 (S.D.N.Y.1977) (Weinfeld, J.); *see SEC v. Research Automation Corp., supra* ; *Mutual Marine Office Inc. v. Atwell, Vogel & Sterling, Inc.*, 485 F.Supp. 351 (S.D.N.Y.1980); *Laurie Visual Etudes, Inc. v. Chesebrough-Pond's, Inc.*, 473 F.Supp. 951 (S.D.N.Y.1979); *Miller v. Schweickart*, 413 F.Supp. 1062 (S.D.N.Y. 1976). That the standards for granting summary judgment are stringent should not lead a court to such a cautious position that it will never utilize this procedural device. In many instances, summary judgment is a means to "[unmask] frivolous claims and [put] a swift end to meritless litigation." *Quinn v. Syracuse Model Neighborhood Corp., supra*, 613 F.2d at 445; *accord, SEC v. Research Automation Corp., supra*, 585 F.2d at 33 ("Indeed, the policy favoring efficient resolution of disputes, which is the cornerstone of the summary judgment procedure, would be completely undermined if unsubstantiated assertions were sufficient to compel a trial."); *United States v. Matheson, supra*, 532 F.2d at 813 (Summary judgment should be granted when "the only issues raised are frivolous or immaterial ones which would simply serve to provide an exercise in futility or a purposeless trial.").

At the commencement of this action, Wilson-Rich alleged that Don Aux breached an express agreement that it would divulge the results of the survey only to the plaintiff. Abandoning that claim, he now argues that, by distributing the report to Cedric and Ernest Bernberg, Don Aux breached an implied agreement—that is, an agreement not expressed orally or in writing, but one that can be reasonably implied from the conduct of the parties and the circumstances. *See* Restatement of Contracts § 3, Comment b (1932); *id.* § 21; 1 Williston on Contracts §§ 3, 22A (3d ed. 1957). On this motion for summary judgment, the evidentiary facts underlying the alleged implied agreement are not disputed; only the inferences to be drawn from them are in dispute.[6] Stated otherwise, the plaintiff argues that the facts raise an inference of an implied agreement; the defendant contends that no such inference can be drawn. To warrant denial of the motion, this Court would have to find that it is reasonable to draw such conflicting inferences. If, on the other hand, "only one inference could reasonably be drawn from the undisputed evi-

---

**5.** For a review of the case law in other circuits, see 6 Moore's Federal Practice ¶¶ 56.15[1.–01] —56.15 [1.–11] (2d ed. 1981).

**6.** *See generally* Asbill & Snell, *Summary Judgment Under the Federal Rules—When an Issue of Fact Is Presented*, 51 Mich.L.Rev. 1143, 1145–48 (1953).

dentiary facts, then summary judgment would be proper, for, in the language of Rule 56(c), 'the moving party is entitled to a judgment as a matter of law.'" *Empire Electronics Co. v. United States*, 311 F.2d 175, 180 (2d Cir. 1962) (Kaufman, J.).

 Although mindful that it must draw all reasonable inferences in favor of the plaintiff, this Court must conclude that, on the evidence before it, no reasonable person could infer that there had been a meeting of the minds resulting in an implied promise to distribute the report only to Wilson-Rich.[7] The written contract does not indicate that only Wilson-Rich would receive a copy of the report. Moreover, there were no conversations on the subject. In their affidavits, the employees of Don Aux who dealt with Wilson-Rich—O'Connor, Cummings, and Auerbach—claim that the plaintiff was never told that only he would receive the results of the survey, that the plaintiff never instructed them to give the results only to him, and that there was no discussion concerning limitations on the distribution of the report. Indeed, Wilson-Rich does not dispute these assertions. He admits that there was no discussion concerning distribution, and that neither O'Connor, Cummings, nor Auerbach represented that the report would be sent only to him. But the plaintiff argues that "there was no need for a discussion with or requests of or instructions to Don Aux [because] plaintiff already had such an understanding." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 5. To support this assertion and to avoid summary judgment, he points to three things: a letter addressed to Wilson-Rich as president of

Rocket that was marked "Personal and Confidential"; "[d]efendant's own data sheet on the 'client' [that] clearly refers to only ... the plaintiff"; and the fact that Wilson-Rich was identified as the client in the handwritten addendum to the written contract. *Id.* at 9–10.

These facts, however, are insufficient to defeat the motion for summary judgment. *See Beidler & Bookmyer, Inc. v. Universal Ins. Co.*, 134 F.2d 828, 831 (2d Cir. 1943) (evidence that the "appellee's vice-president and the president of the insured were 'regular luncheon companions' and 'warm personal friends'" was insufficient to raise an inference that the appellee induced the insured to cancel an insurance policy). The addendum to the contract makes no reference to the plaintiff and merely states that payment of the fee was subject to the "client's" approval. The document that plaintiff refers to as the "client sheet" is actually entitled "Sales Survey Report." Rocket is listed as the "company" and the plaintiff as the "survey authorizer." The second page has a number of form questions concerning "the client," some of which call for responses about an individual—presumably the survey authorizer. In the "Comments" segment, the need for Rocket-London's approval before the defendant's consulting services could be employed is stressed; consequently, it is stated that the results of the survey should be in writing to the extent possible. These facts do not indicate that Wilson-Rich was a party to the contract between Rocket and Don Aux; at most, they merely confirm his status as president of Rocket and the corporate agent who authorized the survey.[8]

---

7. To create a contract, there must be mutual assent to the terms of the contract. *Restaurant Associates Industries, Inc. v. Anheuser-Busch, Inc.*, 397 F.Supp. 1213, 1217 (S.D.N.Y.1975). That a party alleges an implied, rather than an express, agreement does not abrogate this requirement. 1 Williston on Contracts, *supra*, § 3, at 11.

8. The allegations by Wilson-Rich in this suit raise an interesting question regarding his duty to Rocket as president of the company. A corporate officer owes a fiduciary duty to the

corporation. He is obligated to act solely for the benefit of the corporation, and he is not permitted to use his position for personal advantage or profit. Any advantage or profit that is improperly received belongs to the corporation. 3 W. Fletcher, Cyclopedia of the Law of Private Corporations § 850, at 175–76 (rev. ed. 1975); *accord, Pepper v. Litton,* 308 U.S. 295, 311 [60 S.Ct. 238, 247, 84 L.Ed. 281] (1939). When Wilson-Rich contracted with Don Aux on behalf of Rocket for a report to be paid for by Rocket, he was acting as a corporate officer. Thus, if there had been any merit to Wilson-

Allowing the plaintiff to proceed with this claim would result in a needless trial on a meritless claim, thereby undermining the policies fostered by Rule 56. Accordingly, the defendant's motion for summary judgment on Count One is granted.

## II. Intentional Interference With Employee Relations

The second cause of action has proved troublesome, not because of any particularly thorny questions of law, but because it has been difficult to unravel the plaintiff's papers to determine exactly what legal theory is being advanced. As noted above, Count Two of the complaint seeks recovery for something called intentional interference with employee relations. Perhaps recognizing that there is no such legal theory, however, the plaintiff appears to have split this count into two theories of liability: the first sounds in contract, the second in tort.

Had plaintiff's cause of action been based solely on the theory stated in the complaint, Count Two would have been summarily dismissed for failure to state a claim upon which relief can be granted. To ensure that no meritorious claim is lurking beneath the complaint, however, plaintiff's theories of liability delineated in his motion papers have been treated as if they had been properly pleaded as separate causes of action. Nevertheless, neither one is sufficient to warrant continuation of this lawsuit.

### A. Contract Theory

Under the contract theory, Wilson-Rich alleges that Don Aux entered into an oral contract with each Rocket employee who completed the questionnaire. The terms of the contract were that, if the questions were answered, Don Aux would maintain the identity of the employee in confidence. Moreover, Wilson-Rich asserts that all other employees, including himself, were third-party beneficiaries of Don Aux's promise of anonymity. When Don Aux referred to employees by name or job description in the report, therefore, Wilson-Rich allegedly had a cause of action against Don Aux for breach of contract.[9]

█ Assuming that there were valid contracts between Don Aux and each employee who completed the questionnaire, Wilson-Rich could prevail if he were to prove his status as a third-party beneficiary. See Lawrence v. Fox, 20 N.Y. 268 (1858); J. Calamari & J. Perillo, The Law of Contracts § 243 (1970). Thus, it appears improvident to grant defendant's request to dismiss for failure to state a claim. See Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) ("complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"); J. Baranello & Sons v. Hausmann Industries, Inc., 86 F.R.D. 151, 158 (E.D.N.Y.1980) (same). This Court can and will, however, grant defendant's alternative request for summary judgment.[10]

Rich's contention that Don Aux had impliedly promised to distribute the results of the survey only to him, it seems appropriate to have concluded that Wilson-Rich breached his fiduciary duty to Rocket by using his position for personal advantage. Although the study was to be performed for the benefit of Rocket, Wilson-Rich would have been able to keep the results from the other stockholders. This would have been particularly advantageous to him—and detrimental to Rocket—in light of the fact that the report was highly critical of his performance as president of the company.

9. Even if Wilson-Rich was a third-party beneficiary of a valid oral contract between Don Aux and each employee who completed the questionnaire, identifying individual employees in

the report might not have constituted a breach of contract. For example, if the individual employee waived his right to anonymity and Wilson-Rich's rights had not vested, he would not have a cause of action against Don Aux. See J. Calamari & J. Perillo, The Law of Contracts § 251 (1970).

10. The propriety of granting summary judgment could have been considered in this case even if the defendant had not made such a request. Rule 12(b)(6) provides that

if, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for

■ "[A] third party may sue on a contract only if the parties to that contract intended to confer a benefit on him when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to him." *Vazman, S.A. v. Fidelity International Bank,* 418 F.Supp. 1084, 1086 (S.D.N.Y.1976) (footnote omitted); *accord, German Alliance Insurance Co. v. Home Water Supply Co.,* 226 U.S. 220, 230, 33 S.Ct. 32, 35, 57 L.Ed. 195 (1912); *Bernal v. Pinkerton's Inc.,* 52 A.D.2d 760, 382 N.Y.S.2d 769, 770 (1st Dep't 1976), *aff'd mem.* 41 N.Y.2d 938, 394 N.Y.S.2d 638, 363 N.E.2d 362 (1977); *Snyder Plumbing & Heating Corp. v. Purcell,* 9 A.D.2d 505, 508, 195 N.Y.S.2d 780, 783 (1st Dep't 1960). At best, Wilson-Rich is an incidental beneficiary; it is patently unreasonable to assert that he was a third-party beneficiary capable of enforcing the alleged oral agreement. With discovery now complete, there is not a shred of evidence to indicate that any employee who responded to the questionnaire intended Wilson-Rich to be the beneficiary of Don Aux's alleged promise of anonymity. Rather, the only reasonable inference that can be drawn is

that the promise was intended to protect the employee from recrimination for any harsh comments. Thus, because no genuine issue of fact exists, and because the defendant is entitled to judgment as a matter of law, summary judgment for the defendant is granted on Count Two insofar as it is premised on the contract theory.[11]

### B. Tort Theory

Of all the theories of liability advanced by the plaintiff, his tort theory is certainly the most imaginative. Actually, it is identical to his third-party beneficiary theory except that it is characterized by the language of tort law rather than contract law. According to the plaintiff, by entering into contracts with Rocket and the employees who completed questionnaires, Don Aux assumed a duty to all Rocket employees, including himself, to act in a manner that would not adversely affect the working relationships among the employees.[12] Plaintiff argues that, by revealing the identities of individuals in the report, Don Aux breached its duty and severely damaged Wilson-Rich's relationship with other employees at Rocket.[13]

summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(b)(6).

11. For a discussion of the standards for granting summary judgment, see pt. I *supra.*

12. It is unclear from the plaintiff's papers whether this alleged duty arose solely as a result of Don Aux's contract with Rocket or as a result of both that contract and the alleged oral contracts with the employees who completed the questionnaires. Resolution of this question, however, is irrelevant to the disposition of this motion.

13. The essence of this theory may perhaps best be gleaned from plaintiff's own words. In his memorandum of law in opposition to these motions, it is written that

[b]y entering into the contract with Rocket, Defendant placed itself in the position of being obligated to act such that the employees would not be injured. The fact that the employees were not each parties to the others contract per se, and thus not specifically in contractual privity with Defendant does not

negative Defendant's responsibility where, as here, Defendant's conduct may be expected to affect the interests of each and all the employees. The question is whether Defendant breached a duty it took upon itself. If it has "merely" injured Rocket only Rocket could sue it, but having violated a duty to the employees, and Wilson-Rich is one of them, Defendant is liable.

Defendant, pursuant to its contract with Rocket, owed a duty of confidentiality to Rocket. The *Palsgraf* risk "reasonably to be foreseen" and undertaken by Defendant was that if the results of the confidential employee interviews were made known, i. e. by distribution of the report to other than Plaintiff and/or by the publication of the source attributable to the statements contained in the report, the employee working relationship at Rocket could become untenable. This is exactly what occurred. By breaching its duty of confidentiality Defendant destroyed Plaintiff's ability as an employee to work with the other employees precisely because he knew not just what was said but also who said it.

Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 11–12 (footnote and citation omitted).

■ This theory rests largely on the modern relaxation of the rigid requirements of privity of contract. As Dean Prosser pointed out,

> the absence of "privity" between the parties makes it difficult to found any duty to the plaintiff upon the contract itself. But by entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person.

W. Prosser, The Law of Torts § 93, at 622 (4th ed. 1971) (footnote omitted). That the absence of privity will no longer act as a bar to many claims, however, is insufficient in itself to support Wilson-Rich's cause of action. There must also be a determination that Don Aux owed a duty to Wilson-Rich.

The most famous expression of the principles relating to the question of duty in tort law is Judge Cardozo's opinion in *Palsgraf v. Long Island Railroad*, 248 N.Y. 339, 162 N.E. 99 (1928). In *Palsgraf*, Judge Cardozo wrote that

> [w]hat the plaintiff must show is "a wrong" to herself, *i. e.*, a violation of her own right, and not merely a wrong to someone else, nor conduct "wrongful" because unsocial, but not "a wrong" to any one. . . . The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension.

*Id.* at 343–44, 162 N.E. 99. In other words, to find the existence of a duty in a particular case, it must have been foreseeable that the defendant's conduct would harm the plaintiff.

■ Applying this principle to the case at bar, this Court concludes, as a matter of law,[14] that Don Aux did not breach any duty to Wilson-Rich by identifying individuals in its report. Don Aux's actions might have foreseeably led Wilson-Rich to discharge the *employees who made disparaging statements about Wilson-Rich and Rocket.* To find that it was foreseeable that *Wilson-Rich* would be harmed by these actions, however, would defy all notions of logic and reasonableness.[15] Accordingly, because the defendant owed no duty to the plaintiff, plaintiff has no cause of action, and insofar as Count Two is premised on the tort theory, it is dismissed for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).

## III. *Breach of Assumed Fiduciary Relationships*

Count Three is relatively straightforward. Unlike the second cause of action, the underlying legal theory has not been altered or expanded during the interval between the filing of the complaint and the briefing of these motions. Like the other causes of action, however, this one deserves short shrift. In Count Three, the plaintiff alleges that there was a fiduciary or confidential relationship between he and the defendant, and that by distributing the report to the Bernbergs and identifying the sources of information in the report, the "defendant breached these confidential relationships." Complaint ¶ 27. We believe that Count Three fails to state a claim upon which relief can be granted.

A fiduciary relationship requires the fiduciary to act in the interests of the beneficiary in matters within the scope of the relationship. I Scott on Trusts § 2.5, at 39 (3d ed. 1967). Even the slightest breach of

---

**14.** Whether a duty exists in a particular case is a question of law for the court. W. Prosser, *supra*, § 37, at 206.

**15.** This is especially true in light of the fact that Wilson-Rich does not allege that Don Aux acted wrongfully in including the substance of the harsh comments in the report. Therefore, because Wilson-Rich had reason to know that harsh comments might be in the survey, no one could have foreseen that identifying the *source* of the comments would harm the plaintiff.

this fiduciary duty will subject the breaching party to liability. *See* III *Id.* § 199 (equitable remedies of beneficiary); III *Id.* § 205 (liability for breach of trust). Examples of fiduciary relationships include the relationships between trustee and beneficiary, guardian and ward, agent and principal, and attorney and client. I *Id.,* § 2.5, at 39.

■ No case has been cited to this Court for the proposition that a fiduciary relationship arises between parties to a business transaction, and the plaintiff does not seriously contend that a true fiduciary relationship existed in this case. Rather, he argues that a confidential relationship existed between he and Don Aux, and that "[c]onfidential relationships and fiduciary relationships may be deemed to be synonymous." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 13. Contrary to plaintiff's assertions, however, a confidential relationship is not synonymous with a fiduciary relationship. As Professor Scott noted,

> [a] fiduciary relation is to be distinguished from a merely confidential relation... A fiduciary relation involves certain consequences as to transactions between the parties which flow automatically as a matter of law from the relation. Thus a trustee cannot retain the trust property if he sells it to himself without the consent of the beneficiary whether the transaction is fair or not. On the other hand, where there is merely a confidential relation between the parties, such consequences do not automatically follow. The existence of a confidential relation is simply one of the elements to be considered in determining whether there is fraud or undue influence or overreaching.

I Scott on Trusts, *supra,* § 2.5, at 40. Indeed, the only three cases cited by the plaintiff were actions for rescission on the grounds of fraud, and "the existence of a confidential relation [was] simply one of the elements to be considered in determining whether there was fraud." *See In re Cover's Estate,* 188 Cal. 133, 204 P. 583 (1922); *Roberts v. Parsons,* 195 Ky. 274, 242 S.W. 594 (1922); *Miranovitz v. Gee,* 163 Wis. 246, 157 N.W. 790 (1916).

■ The questions surrounding the duties of the parties to a confidential relationship and the nature of the action that can be maintained for abuse of the relationship, however, need not be addressed by the Court at this time because we conclude, as a matter of law, that no confidential relationship existed between Wilson-Rich and Don Aux. A confidential relationship arises when one gains "the confidence of [another] and purports to act or advise with the other's interest in mind .... [I]t is particularly likely to exist where there is a family relationship or such a relation of confidence as that which arises between physician and patient or priest and penitent." I Scott on Trusts, *supra,* § 2.5, at 39; *see, e. g., In re Cover's Estate, supra,* 188 Cal. 133, 204 P. 583 (1922) (husband and wife); *Roberts v. Parsons, supra,* 195 Ky. 274, 242 S.W. 594 (1922) (aunt and her nephews); *Miranovitz v. Gee, supra,* 163 Wis. 246, 157 N.W. 790 (1916) (two newly arrived Russian immigrants who spoke little English and a countryman who purported to be their friend and protector). Clearly, the relationship between Wilson-Rich and Don Aux is not of the type usually characterized as confidential. If this Court were to allow plaintiff's claim to proceed, it would be saying that Don Aux may have entered into a confidential relationship with Rocket's president simply by virtue of its contract with Rocket.[16] Such an expansion of the definition of a confidential relationship seems inappropriate, especially in light of plaintiff's failure to present analogous precedent or sound policy arguments in support of his view.[17]

16. It may be tenable to argue that Don Aux owed a duty of confidentiality to its client, Rocket, not to disclose information concerning Rocket to individuals outside the company. There is, however, no question as to any breach of this duty because Rocket is not the plaintiff in this lawsuit.

17. Plaintiff has cited only three cases: *In re Cover's Estate,* 188 Cal. 133, 204 P. 583 (1922); *Roberts v. Parsons,* 195 Ky. 274, 242 S.W. 594 (1922); and *Miranovitz v. Gee,* 163 Wis. 246,

Thus, even if a cause of action for breach of a confidential relationship exists,[18] the plaintiff cannot maintain one in this instance. Accordingly, Count Three is dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

SO ORDERED.

---

157 N.W. 790 (1916). As noted above, these cases provide little, if any, support for his position.

18. *See Doe v. Roe*, 93 Misc.2d 201, 400 N.Y. S.2d 668 (S.Ct.1977) (court implied a contract between physician and patient and allowed patient to sue physician for disclosure of confidential information).